SEBASTIAN INTERNATIONAL,
INC., Plaintiff,

v.

CONSUMER CONTACT (PTY) LTD.,
d/b/a 3–D Marketing Services, Fabric
Limited, Hiltexan Ltd., Quality King
Manufacturing, Inc., Quality King Dis-
tributors, Inc., and John Does Nos. 1–5,
Defendants.

Civ. A. No. 87–1995.

United States District Court,
D. New Jersey,
Civil Division.

June 30, 1987.

Berger & Steingut, New York City by Robert A. Weiner, David B. Wechsler, Shanley & Fisher, P.C., Morristown, N.J. by Charles A. Reid, III, for plaintiff.

Greenberg, Dauber & Epstein, P.C., Newark, N.J. by Melvin Greenberg, Ina B. Lewisohn, Steven D. Scharfetter, for defendants Hiltexan Ltd. and Fabric Ltd.

BARRY, District Judge.

Gray market goods are authorized authentic imports which are available in this country outside of their normal channels of distribution. Sometimes called "parallel imports", gray market goods are almost always sold for less in the United States than products sold through authorized channels.[1] Traditionally, American businesses have sought to prevent the entry of gray market goods under both contract and trademark theories.[2] Under either theory, however, the result is unpredictable and, thus, unreliable.

Under a contract theory, courts require that a plaintiff establish that the holder of gray market goods had actual knowledge of contractual territorial limitations between the original licensee and licensor. *Johnson & Johnson Products, Inc. v. DAL International Trading*, 798 F.2d 100 (3d Cir.1986). Gray market goods often exchange hands numerous times before they enter this country, making this "actual knowledge" requirement a difficult burden for plaintiffs. The burden is especially great in applications for temporary restraining orders, invariably the manner by which the vast majority of these cases commence.[3]

Similarly, a trademark owner cannot with impunity rely on its mark given the wide split of authority as to what protection the Lanham Act provides against the importation of gray market goods. *See* Note, *Vivitar Corp. v. United States: Protection Against Gray Market Goods under 19 U.S.C. Section 1526*, 60 So.Cal.L. Rev. 179 (1986) and Note, *The Graying of American Trademarks: The Genuine Goods Exclusion Act and the Incongruity of Customs Negotiation*, 17 C.F.R. § 133.-21, 54 Fordham L.Rev. 83 (1985). On December 8, 1986, the Supreme Court of the United States granted *certiorari* in *Coalition to Preserve the Integrity of American Trademarks v. United States*, 790 F.2d 903 (D.C.Cir.1986), *cert. granted sub nom., K–Mart Corporation v. Cartier, Inc.*, —— U.S. ——, 107 S.Ct. 642, 93 L.Ed.2d 699 (1986), in order to decide the breadth of protection available under the Lanham Act and section 526(a) of the Tariff Act of 1930 codified at 19 U.S.C. § 1526(a) (1982).

The case now before me raises the relatively new issue of what protection, if any, the Copyright Act of 1976 provides against the unauthorized importation of gray market goods. I find that the Act does, indeed, provide such protection and that, accordingly, the relief plaintiff seeks will be granted.

1. *See* Fletcher & Weinberg, 1985–86 Trademark Law Hornbook 166 (1986). The rise in value of the American dollar relative to foreign currencies is widely credited for the increased number of gray market goods available in the United States. Nolan-Hanley, *The Competitive Process and Gray Market Goods*, 5 N.Y.L.Sch.J. Int'l Comp. L. 231, 232 (1984). Interestingly, the recent decline of the American dollar and the resulting rise in domestic prices appear to be fueling the desire of the American consumer to seek out lower priced gray market imports. While consumers do benefit from bargain prices, they are often surprised to discover that these goods are not covered by domestic warranties. *See, e.g., Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1173 (S.D.N.Y.1984). Addi-tionally, gray market goods often lack English language instructions or certifications. *See, e.g., Original Appalachian Artworks, Inc. v. J.F. Reichert, Inc.*, 658 F.Supp. 458, 462 (E.D.Pa. 1987).

2. *See generally* Gerber & Bender, *The Gray Market: A Legal Enigma*, 59 New York State Bar Journal No. 1 at 41–45 (Jan. 1987) & Special Volume on Gray Market, 11 N.C.J. Int'l L. & Comm. Reg. (1986).

3. *See* Turner, *Grey [sic] Market Litigation in the United States District Courts*, 11 N.C.J. Int'l L. & Comm. Reg. 349–68 (1986).

## I

Plaintiff, Sebastian International, Inc. ("Sebastian"), is a California corporation engaged in the development, manufacture, and marketing of beauty products including shampoos, conditioners, and hair sprays. Sebastian alleges that its products are, or should be, available in the United States only in professional hair care salons. Complaint ¶ 2.

The following facts appear uncontested. In February, 1986 defendant Consumer Contacts (PTY) Ltd., d/b/a 3–D Marketing Services ("3–D"), a South African company, sought to become the first distributor of plaintiff's products in South Africa. *Id.* ¶ 14. Sebastian and 3–D entered into a six month trial agreement, pursuant to an oral contract, under which 3–D agreed to distribute Sebastian's products to professional hair care salons located only in South Africa and its territories and not to distribute these products in any other country or territory. *Id.* ¶ 16.

On January 29, 1987, Sebastian shipped four shipping containers of various Sebastian products valued at $218,467.95 to 3–D in Edenvale, South Africa. 3–D did not open these containers but shipped them back to the United States. They arrived in Newark, New Jersey on May 4, 1987 and were released by the United States Customs Service on May 14, 1987.

On Friday, May 22, 1987, Sebastian applied *ex parte* for an order to show cause restraining defendants from disposing of the products in any manner. While the complaint sounded in breach of contract and trademark, the application for a preliminary injunction was premised solely on contract principles. Counsel indicated that the products in question were not copyrighted. The court was led to believe that the products were, as of that date, in the possession of the Quality King defendants. Sebastian's submissions in support of the restraints established that the Quality King defendants knew generally of the sales limitations imposed on Sebastian products. Accordingly, these defendants could not have been good faith purchasers for value. Based on these allegations and on the assertion that Sebastian products are not generally available in the United States, the court found that plaintiff had shown both irreparable harm and a likelihood of success on the merits. The court, therefore, issued the order to show cause including the requested restraints.

On May 28, 1987, counsel for Sebastian and defendant Fabric Limited ("Fabric") appeared before the court. After hearing both parties, an amended order was signed allowing for expedited discovery on the sole question of the whereabouts of the products, a question to which the answer had become less than clear. Counsel for plaintiff indicated that, contrary to their earlier representation, the products at issue were, in fact, copyrighted. They indicated that they would be amending the complaint to include a copyright claim and would move for a preliminary injunction on that ground as well.

On June 2, 1987, Fabric filed a notice of motion pursuant to Fed.R.Civ.P. 65 to dissolve the temporary restraints arguing that plaintiff had failed to demonstrate that Fabric, which, it turned out, was in possession of the products, had actual notice of any limitations on those products as required by the Court of Appeals for the Third Circuit in *DAL International Trading, supra,* 798 F.2d at 106. On June 3, 1987, plaintiff amended its complaint to allege, *inter alia,* a violation of 17 U.S.C. § 602 (1982). More specifically, plaintiff alleged that it had certificates of copyright for the text appearing on two of its products, WET and Shpritz Forte. Additionally, plaintiff claimed that all of the remaining products at issue here bear an appropriate copyright symbol and that registration is pending for each of them. Plaintiff further claimed that it has never authorized any of the defendants to import its products or to distribute them in the United States.

A hearing was held on June 4, 1987 and, on June 5, 1987, the court entered an order dissolving the temporary restraints premised on the contract claim. Simultaneously, however, those restraints were reimposed based on the newly added copyright

allegations. Relying on plaintiff's representation that it had either a certificate of copyright or had filed a registration form and fee with the Copyright Office for the texts of each of the products listed on the bill of lading, I found that Sebastian was likely to prevail on the merits.

On the motion for a preliminary injunction now before me, "the party seeking [the injunction] bears the burden of producing evidence sufficient to convince the court that (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by denial of the relief; (3) granting preliminary relief will not result in even greater harm to the other party; and (4) granting preliminary relief will be in the public interest." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). I turn first to a discussion of the merits of plaintiff's copyright claim.

## II

Fabric raises several reasons why it believes plaintiff's copyright claim is defective. First, Fabric argues that registration is a prerequisite to an infringement action under 17 U.S.C. § 411 (1982), and that plaintiff only has certificates of registration for the texts of two of the numerous products at issue here. In *Apple Barrel Productions v. Beard*, 730 F.2d 384, 386–87 (5th Cir.1984) *citing* 2 Nimmer on Copyright § 7.16[B][1][4], the Fifth Circuit held that the requirements of § 411 are satisfied, in accordance with 17 U.S.C. § 410(d) (1982), when an application for registration,

fee, and deposit are received at the Copyright Office. As noted above, Sebastian had alleged in its amended complaint and orally represented to the court on June 4, 1987 that it had pending applications at the Copyright Office relating to each of the products listed on the bill of lading. Relying on Sebastian's representations, I found that it had complied with *Beard* and was entitled to the requested restraints.

At the preliminary injunction hearing, however, it was established that, except as to the WET and Shpritz Forte texts[5], no applications for any of the other texts on the other products had been received at the Copyright Office until, at the earliest, June 5, 1987.[6] Plaintiff concedes that applications are not filed when mailed but only when received in the Copyright Office, *see* 2 Nimmer on Copyright § 7.16[B] (1986), and now presses a preliminary injunction on copyright grounds only as to WET and Shpritz Forte.

## III

Second, Fabric argues that the texts at issue here are not copyrightable. The leading case on the issue of copyrightability is *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903) (Holmes, J.), which held that a work is protected under the Copyright Act if it is an original creation and owes it origin to the author. *See also Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99 (2d Cir.1951).

---

**4.** Patry, Latman's The Copyright Law 184 n. 44 (1986), criticizes *Beard* as negating a special procedure initiated by the Register of Copyright to allow a copyright owner to secure a certificate of copyright on an expedited basis. I find this criticism without foundation. The Copyright Act of 1976 went to great pains to eliminate the necessity of formality in securing and protecting a copyright. Compare sections 401 et seq of the 1976 Act with sections 10, 11, 13, & 19–21 of the 1909 Act. *Beard* is consistent with that approach. Moreover, Patry's approach would place the internally created procedures of the Register above the clear statutory language of 17 U.S.C. 410(d) (1982).

**5.** Fabric notes that the two copyright certificates presented to the court indicate that both texts

were in use for three years prior to registration and argues that there is no proof that during these three years the packaging bore a copyright notice as specified by 17 U.S.C. §§ 401, 402 & 403 (1982). Fabric ignores, however, the import of 17 U.S.C. § 405(a)(2)(1982) which states that the omission of a copyright notice does not invalidate the copyright in a work if registration is made within five years of the publication without notice. It is possible, however, that plaintiff has forfeited any claim to statutory damages or attorney fees. 17 U.S.C. § 412(2) (1982).

**6.** It appears that plaintiff's counsel understood that Sebastian's copyright counsel had, in fact, filed those applications prior to June 4, 1987.

It is well established that labels are subject to copyright protection, *see Kitchens of Sara Lee, Inc. v. Nifty Foods Corp.*, 266 F.2d 541 (2d Cir.1959), if the label manifests the necessary modicum of creativity. *See, e.g., Drop Dead Co. v. S.C. Johnson & Son, Inc.* 326 F.2d 87 (9th Cir. 1963) (copyright in PLEDGE label is valid); *Abli Inc. v. Standard Brands Paint Co.*, 323 F.Supp. 1400 (C.D.Cal.1970) (label was copyrightable when it contained such phrases as "Cut to desired length ... Will not run ... Simply slide top bead into rod as illustrated"). Catch phrases, mottos, slogans and short advertising expressions are not copyrightable. *See, e.g., Perma Greetings Inc. v. Russ Berrie & Co., Inc.*, 598 F.Supp. 445 (E.D.Mo.1984) (expressions such as "hang in there" and "along the way take time to smell the flowers" not copyrightable). But, of course, the length of a sentence is not dispositive of whether it is subject to protection. *Rockford Map Publishers, Inc. v. Directory Service Co. of Colorado, Inc.* 768 F.2d 145, 148 (7th Cir.1985).

The following, taken from a WET 4 container, is an example of text being challenged in this case.

> Hair stays wet-looking as long as you like. Brushes out to full-bodied dry look. WET 4 is one step-four choice (finishing) in Sebastian's four step program for a healthy scalp and head of hair. WET is not oily, won't flake and keeps hair wet-looking for hours, allowing you to sculpture, contour, wave or curl. It stays looking wet until it's brushed out. When brushed, hair looks and feels thicker, extra full. Try brushing partly, leaving some parts wet for a different look.

This language is more than simply a list of ingredients, directions, or a catchy phrase. No one can seriously dispute that if plaintiff were to discover that a competitor's package utilized the exact language as above with the exception of the product's name, plaintiff would be entitled to protection. While this text tries the limits of the modicum of creativity necessary for a work to be copyrightable, I find that taken as a whole it comes within the purview of the Copyright Act.

## IV

Third, Fabric argues that § 602 of the Copyright Act of 1976 does not apply to this case because the products in question were manufactured in the United States. Additionally, Fabric contends that, pursuant to 17 U.S.C. § 109 (1982), any right of plaintiff to control the importation of these parallel imports was extinguished when these items were first sold because title to the products passed in the United States prior to their shipment to South Africa.

An understanding of these arguments requires that the court review both the relevant statutory provisions and the limited case law interpreting the interplay of sections 602, 106(3) and 109(a) of the Copyright Act. Section 602 provides in relevant part:

> Importation into the United States, without the authority of the owner of copyright under this title, of copies and phonorecords of a *work that have been acquired outside the United States* is an infringement of the exclusive right to distribute copies or phonorecords under section 106, actionable under section 501. (emphasis added).

Section 602, often called the importation right, grants the copyright owner a distribution right as defined in § 106.

Section 106 states:

> Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
>
> (1) *to reproduce the copyrighted work in copies or phonorecords;*
>
> (2) to prepare derivative works based upon the copyrighted work;
>
> (3) *to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;*
>
> (4) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and motion pictures and other audiovisual works to perform the copyrighted work publicly; and

(5) in the case of literary, musical, dramatic, and choreographic works, pantomimes, and pictorial, graphic or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly. (emphasis added).

As is made clear in the first sentence of § 106, these exclusive rights are subject to the limitations set out in the twelve sections following it. Section 106(3), the distribution right, is limited in part by § 109(a) which states:

Notwithstanding the provisions of section 106(3), the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, *to sell or otherwise dispose of the possession* of that copy or phonorecord. (emphasis added).

At first blush, sections 602(a) and 109(a) appear to conflict because § 109(a), the first sale doctrine, seems to allow for the very acts prohibited by § 602(a), the importation right.

## A

The first case to discuss the interplay between these sections of the Copyright Act was *CBS, Inc. v. Scorpio Music Distributors, Inc.*, 569 F.Supp. 47 (E.D.Pa. 1983), *aff'd mem.*, 738 F.2d 424 (3d Cir. 1984)[7]. CBS had authorized a foreign company to manufacture certain phonorecords. The phonorecords were manufactured and sold in the Philippines and thereafter imported into the United States for distribution by Scorpio. CBS claimed that Scorpio was an infringer under § 602. Scorpio argued, *inter alia*, that the first sale doctrine extinguished CBS's importation right.

The district court rejected that argument in what can only be described as cryptic language:

Defendant's contentions would be more persuasive were it not for the phrase—

lawfully made under this title—in § 109(a). I conclude that the section grants first sale protection to the third party buyer of copies which have been legally manufactured and sold within the United States and not to purchasers of imports such as are involved here. The protection afforded by the United States Code does not extend beyond the borders of this country unless the Code expressly states. Absent a clearly expressed legislative intent to the contrary, statutory language must be recognized as conclusive [citations omitted]. 569 F.Supp. at 49.

The court also noted that acceptance of the defendant's argument would render the importation right "virtually meaningless" and would undermine the purpose of § 602. *Id.*

It is important to note that the quoted paragraph contains the seeds of two separate contentions which run through the cases which follow *Scorpio* and which will be addressed, *infra*. First, the phrase "lawfully made under this title" has been interpreted to mean "lawfully made in the United States", thereby limiting the first sale doctrine to cases involving domestically manufactured works. Second, *Scorpio* has been read to stand for the proposition that the first sale doctrine does not apply to foreign first sales because the United States Code does not apply extraterritorially.

The next case to discuss the importation right was *Cosmair, Inc. v. Dynamite Enterprises, Inc.*, 226 U.S.P.Q. 344 (S.D.Fla. 1985) [Available on WESTLAW, DCT database]. There, defendants, without permission of the copyright owner, imported certain cosmetic products manufactured in the United States for which plaintiff held the copyrights. As in *Scorpio*, the defendants argued that § 602(a) was limited by the first sale doctrine. The court, citing generally to *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908), began its analysis noting that "[t]he 'first sale' doctrine states that the sale of copies

---

**7.** I do not ignore the fact that *Scorpio* was affirmed without opinion by the Third Circuit. An affirmance without opinion, however, does not make the reasoning below or the result above binding on me. In any event, the analysis adopted here would not have changed the outcome in *Scorpio*.

of a work that have been legally manufactured with the copyright owner's consent extinguishes the copyright owner's distributive rights as to those copies." 226 U.S. P.Q. at 346. After reviewing *Scorpio*, the court proceeded to determine whether there was a sale of the contested products within the United States. Because it found that the invoice and contract of sale indicated that the imports were shipped C.I.F., the court concluded, in accordance with the Uniform Commercial Code, that title passed in the United States. *Id.* Applying the *Scorpio* standard, the court found that the first sale doctrine was likely to apply and extinguish plaintiff's importation right. Plaintiff's application for a preliminary injunction was, therefore, denied.

It bears mention that *Cosmair* expressed "some doubt as to the validity of the reasoning about the relation between 602(a) and 109(a) in *Scorpio*." 226 U.S.P.Q. at 347. However, the court discovered legislative history which cited as an example of the proper application of § 602(a) a situation in which the imported goods were manufactured outside the United States. As a result the court was apparently satisfied that regardless of where title to the imports passed, § 109(a) provides a valid defense to a § 602(a) action when the goods are manufactured in the United States. *Id.*

*Hearst Corp. v. Stark*, 639 F.Supp. 970 (N.D.Cal.1986), involved the unauthorized importation of books published in England. Again, defendants raised the first sale doctrine as a defense. The court began its analysis by noting that

> [i]nitially, it is questionable whether section 109 has any application to liability under section 602. That is, the language of section 109 provides an exemption from liability under section 106. Section 602 is a separate statute which was passed after section 109. Section 602 does refer to section 106, but it appears to create rights and liabilities in addition to those in section 106. And as discussed above, it is apparent from both the language of section 602 and the intent of Congress that the purpose of section 602 was to preclude the importation of copy-

righted works lawfully produced elsewhere. 639 F.Supp. at 976.

This last sentence seems premised on *Cosmair's* discussion of the legislative history. Continuing, the court found that even if the first sale doctrine applied, it

> only applies to the the resale of "a particular copy" of a work. Here, defendants are importing large quantities of titles, which they acquired from wholesale distribution channels, for the purpose of multiple resales in the United States. Even if section 109 did permit booksellers to sell a particular copy of a copyrighted work, that section would not authorize the wholesale importation and redistribution of multiple copyrighted works in conflict with section 602. The singular language of section 109 contrasts with the pluralistic language of section 602, which refers to importation, copies and distribution. *Id.*

The court reviewed both *Scorpio* and *Cosmair* and found that while those cases did not provide any clear-cut rule of the relationship between the first sale doctrine and the importation right, they did indicate that the first sale doctrine should be interpreted narrowly. The court concluded that "section 109 does not limit the application of section 602 where defendants make wholesale importations into the United States of copyrighted materials manufactured outside this country." 639 F.Supp. at 977.

The most recent case to discuss this issue, *T.B. Harms Co. v. JEM Records, Inc.*, 655 F.Supp. 1575 (D.N.J. 1987), followed the *Scorpio* analysis and held that a licensed importer of copyrighted phonorecords is required to receive authorization not only from the copyright owner of the phonorecords but also from the copyright owner of the underlying sound recordings. The court found *Scorpio* dispositive and, in granting plaintiff's motion for summary judgment, noted that § 109(a) affords protection "only to third party buyers of copies which have been legally manufactured and sold in the United States and not to purchasers of imports." 655 F.Supp. at 1583.

## B

These four cases do, indeed, support Fabric's argument that § 602 does not prevent the unauthorized importation of the domestically produced parallel imports Fabric wishes to sell. However, a closer look at the reasoning underlying those cases indicates that that reasoning is flawed and that Fabric's reliance on the cases is, thus, misplaced.

*Scorpio's* holding is premised on two findings. First, the *Scorpio* court found that the phrase "lawfully made under this title" in § 109 means "lawfully made—manufactured—in the United States". As noted by the *Cosmair* court, the legislative history specifies that § 602(a) applies "where the copies or phonorecords were *lawfully made* but their distribution in the United States would infringe the United States Copyright Owner's exclusive rights." 226 U.S.P.Q. at 347 *citing* H.R. Rep. No. 1476, 94th Cong., 2d Sess. 170 (1976) (emphasis added) *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5785–86 [hereinafter 1976 House Report]; S.Rep. No. 473, 94th Cong., 1st Sess. 72 (1975) [hereinafter 1975 Senate Report]. The use of the same phrase "lawfully made" in both § 109(a) and § 602(a) undercuts the *Scorpio* court's dicta that § 109(a) can limit § 602 if the goods are not manufactured abroad. *See id.*

▓ The legislative history also confirms that the phrase "under this title" in § 109(a) does not mean, as suggested by *Scorpio*, "in the United States". In promulgating § 109(a), Congress did not intend to change the first sale doctrine as codified in § 27 of the 1909 Copyright Act and interpreted in the case law. 1976 House Report at 79, 1976 U.S.Code Cong. & Ad.News p. 5693. Section 27 provided that "nothing in this title shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work the possession of which has been lawfully obtained." Act of March 4, 1909, Ch. 320, § 27, 35 Stat. 1075. Under § 27, it was unclear whether the first sale of a piratical copy extinguished the copyright owner's rights because that copy was often "lawfully obtained." Section 109(a) was drafted to make clear that the first sale doctrine only applied to copies or phonorecords made in accordance with the Copyright Act.[8] Thus, § 109(a) should be read to provide that, notwithstanding a copyright owner's distribution right, the owner of a particular copy or phonorecord made in compliance with the Copyright Act—either with the copyright owner's authorization or pursuant to one of the Act's compulsory licenses—may vend that particular copy or phonorecord without the permission of the copyright owner.

The *Cosmair* court further developed the place of manufacture contention raised in *Scorpio*. First, *Cosmair*, following *Scorpio's* lead, erroneously explained the first sale doctrine in terms relating to place of manufacture. The only support offered for this was a general citation to *Bobbs-Merrill Co. v. Straus*, 210 U.S. 339, 28 S.Ct. 722, 52 L.Ed. 1086 (1908). The Supreme Court in that case, however, merely held that "the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose, by notice ... a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract." 210 U.S. at 350, 28 S.Ct. at 726.

The second argument advanced by the *Cosmair* court for not applying § 602(a) to imports manufactured in the United States was based on one example in one of the numerous legislative reports generated during the more than fifteen years the

---

**8.** The 1976 House Report at 79, 1976 U.S.Code Cong & Ad.News p. 5693 explains

> To come within the scope of section 109(a), a copy or phonorecord must have been "lawfully made under this title" though not necessarily within the copyright owner's authorization. For example, any resale of an illegally counterfeited phonorecord would be an in-

fringement, but the disposition of a phonorecord made under the compulsory licensing provision of section 115 would not.

This point is elaborated upon in Note, *Parallel Importing Under the Copyright Act of 1976,* 17 N.Y.U.J. Int'l L. & Pol. 113, 126–34 (1984) *reprinted in* 32 J. Copr. Soc'y 211 (1985) [hereinafter N.Y.U. Note].

Copyright Act was being revised. Because this report cited "as an example of a situation in which § 602(a) would apply 'where the Copyright owner had authorized the making of copies in a foreign country for distribution in that country,'" 226 U.S.P.Q. at 347 (citations omitted), the court concluded that § 602(a) would not apply where the copies or phonorecords were produced in the United States.

Preliminarily, there is a logical flaw in deducing from one example that all other potential fact patterns are excluded, unless the facts in the example are specifically stated to be the sole set of facts justifying relief. More importantly, reliance on comments in the legislative history of persons other than the elected representatives who passed a law is generally frowned upon in interpreting the intent of Congress. *Harms, supra,* 655 F.Supp. at 1581; *Harry Fox Agency, Inc. v. Mills Music Inc.,* 543 F.Supp. 844, 864 (S.D.N.Y.1982) (Weinfeld, J.), *rev'd,* 720 F.2d 733 (2d Cir.1983), *rev'd sub nom. Mills Music Inc. v. Snyder,* 469 U.S. 153, 105 S.Ct. 638, 83 L.Ed.2d 556 (1985). While the general flow and development of such remarks can be instructive, it is well established that individual remarks carry little or no weight in ascertaining the intent of Congress. *Id. Cosmair's* reliance on one example in a vast and confusing legislative history [9] is not sound, particularly where the example relied upon does not suggest that § 602(a) would only apply in the situation the example described.

Importantly, there is nothing on the face of § 602(a) which indicates that the place of manufacture is relevant to the scope of protection. The only requirement in § 602(a) regarding locale is that the goods be *"acquired* outside the United States" (emphasis added). The place of manufacture is simply not germane to a discussion of either § 602(a) or § 109(a).[10] Accordingly, I reject Fabric's argument that it may import plaintiff's products simply because they were manufactured in the United States.

*Scorpio* also instructs that the first sale doctrine does not apply to sales outside the United States because "[t]he protection provided by the United States Code does not extend beyond the borders of this country unless the Code expressly states." 569 F.Supp. at 49. This statement is neither completely accurate nor fully developed. A more accurate expression of the underlying legal principle is found in *Beechwood Music Corp. v. Vee Jay Records,* 328 F.2d 728, 729 (2d Cir.1964), also a copyright case, in which the Hon. Henry Friendly explained that, absent clearly expressed statutory intent to the contrary, the presumption is that the United States Code does not apply to actions not occurring in, *or having an effect in,* the United States. *See also Securities and Exchange Commission v. Kasser,* 391 F.Supp. 1167, 1174 (D.N.J. 1975). A foreign sale, to the extent it does not satisfy the first sale doctrine, has an extremely significant effect in the United States because it defines the United States copyright owner's exclusive rights.[11]

**9.** Two commentators, both purporting to analyze the legislative history surrounding § 602, and both critical of *Scorpio,* have reached diametrically opposed views as to the meaning of that history. *Compare* N.Y.U. Note with Tyson & Parker, *Parallel Importation of Copyrighted Phonorecord,* 10 N.C.J. Int'l L. & Comm. Reg. 397 (1985).

**10.** The association of place of manufacture with the ability to import a gray market item probably arises from 19 U.S.C. § 1526(a) which on its face limits the protection available to trademark owners to "merchandise of foreign manufacture." The only connection between place of manufacture and copyright protection, however, is the manufacturing clause codified at 17 U.S.C. § 601 (Supp. 1987). Under this clause, certain printed material must be manufactured in the

United States to qualify for copyright protection. Significantly, the manufacturing clause expired on July 1, 1986 thus severing any connection between place of manufacture and copyright protection. *See* Reilly, *The Manufacturing Clause of the U.S. Copyright Law: A Critical Appraisal of Some Recent Studies,* 32 J. Copr. Soc'y 109–37 (1984).

**11.** In *Beechwood,* Judge Friendly held that the publication of a sound recording in Britain did not give the Beatles the right to release their version of that song in the United States under the compulsory licensing provisions of the Copyright Act. Judge Friendly found that a foreign publication of a song did not have an impact in this country and, thus, could not trigger the compulsory licensing right.

If *Scorpio* is correct, Congress need not have passed § 602(a) because a foreign sale would not be a "first sale" and, therefore, *any* further *foreign* distribution could only occur with the copyright owner's consent. The legislative history, however, leaves no doubt that Congress understood that, in enacting § 602(a), it was creating a new right.[12]

The *Cosmair* court followed the *Scorpio* rationale and determined where title to the products had passed. After conducting a hearing on a preliminary injunction application, the court found that plaintiff had failed to prove that title probably passed outside the United States. It was, therefore, likely that defendant had a first sale defense. Because plaintiff could not prove a likelihood of success on the merits, the court denied the application. Significantly, as noted above, the *Cosmair* court refused to rely on this reasoning alone and linked its decision to deny plaintiff's application to the fact that the plaintiff's products were domestically produced.

C

*Stark* represents the first significant movement away from *Scorpio* and its progeny. Although *Stark* paraphrased the language used in *Scorpio* and *Cosmair* and fell into the place of manufacturing trap, it contains the first suggestion that sections 109(a) and 602(a) may not conflict:[13] "it is questionable whether section 109 has any

application to liability under section 602." 639 F.Supp. at 976.

On their face, § 602(a) and § 109(a) do not conflict. Section 602(a) prohibits *importation* of copyrighted works acquired outside the United States. Section 109(a) "provides that where a copyright owner parts with title to a particular copy of his copyrighted work, he divests himself of his exclusive right to *vend* that particular copy." *United States v. Atherton*, 561 F.2d 747, 750 (9th Cir.1977) (citation omitted) *cited in United States v. Bernstene*, CCH Copyright Law Decision Para 25,480 (C.D. Cal.1982) (emphasis added).

*Scorpio* and its progeny wrongly assume that importation is a form of vending. To vend is "[t]o transfer to another for a *pecuniary equivalent*; to make an object of trade, especially by hawking or peddling; *to sell*." Black's Law Dictionary 1394 (rev. 5th ed. 1975) (emphasis added). In contrast, "importation", as defined in Black's Law Dictionary, is "[t]he act of *bringing* goods and merchandise into a country from a foreign country." *Id.* at 680 (emphasis added). *See also Cunard Steamship Co. v. Mellon*, 262 U.S. 100, 122, 43 S.Ct. 504, 507, 67 L.Ed. 894 (1923) ("Importation ... consists in bringing an article into a country from the outside.") While, as a practical matter, importation may involve vending, nothing in the legislative history indicates that the word "importation", as used in § 602, means a bringing in of parallel

---

Superficially, this holding appears to support the *Scorpio* analysis. Reflection, however, makes clear that a foreign publication of a song does not define the rights of a United States copyright owner but only restrains a performer, who may not even live in this country, who wishes to publicly perform that song here. In contrast, whether a foreign sale is a "first sale" impacts on the ability and defines the rights of a copyright owner in this country to control further disposition of his work.

**12.** The Copyright Act of 1976 was more than fifteen years in the making. The first draft of the proposed copyright act did not contain any section analogous to § 602(a). The omission was deliberate. "[W]e do not believe that the prohibition against imports of piratical copies should be extended to authorized copies covered by [licensing agreements]." Staff of House

Comm. on the Judiciary, 87 Cong., 1st Sess. Copyright Law Revision; Report of the Register of Copyright on the General Revision of the United States Copyright Law, Report to the House Comm. on the Judiciary 126 (1961).

**13.** For reasons not explained, *Stark* refused to totally abandon the first sale defense but strictly limited it to sales of particular copies or phonorecords and held it was not applicable to wholesale distribution. But wholesale redistribution or, as it is commonly called, "second hand sales", is exactly the type of conduct protected by the first sale doctrine. *See Bobbs-Merrill, supra*. Second, § 602(a)(2) already provides for the unauthorized importation of particular copies or phonorecords for private use. I know of no authority for concluding that § 109(a) is duplicative or merely a slight enlargement of § 602(a)(2).

imports combined with a sale or transfer of title.

The purported conflict between the first sale doctrine and the importation right arises solely because § 602(a) states that the unauthorized importation of works acquired outside the United States "is an infringement of the *exclusive right to distribute* copies of phonorecords under section 106, actionable under section 501." 17 U.S.C. § 602(a) (emphasis supplied). If Congress had not intended to make the first sale doctrine a limitation on the importation right, the argument goes, it would not have identified the importation right as a species of the distribution right.

This argument assumes that each of the exclusive rights of a copyright owner are completely distinct and separate. The legislative history emphasizes, however, that the exclusive rights in § 106 are "cumulative and may overlap in some cases. Each of the five enumerated rights may be subdivided indefinitely." 1976 House Report at 61, 1976 U.S.Code & Ad.News p. 5674. Indeed, the statutory language suggests that the importation right, while a form of the distribution right, is not identical to it. The Act defines an infringer as "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 [including the distribution right], *or* who imports copies or phonorecords into the United States ..." 17 U.S.C. § 501 (1982) (emphasis added).

If the importation right is not identical to the distribution right, how does it differ? The proper starting point is to recall that "as the term 'copyright' suggests, it is the act of copying which is essential to, and constitutes the very essence of *all* copyright infringement." 2 Nimmer on Copyright § 8.202[A] (1986) (emphasis added). Importation is an "act of copying" because it increases the number of copies or phonorecords of that work available in this country. From the viewpoint of the United States copyright owner, importation of works acquired outside the United States interferes with his fundamental right to control the number of copies or phonorecords available of his work in this country no less than the mass copying of his work which might occur at the local copy shop.

Moreover, I am not overly troubled by the fact that § 602(a) is labeled a "distribution right".[14] As Nimmer has noted, the distribution right is a form of the reproduction right. It would make no sense if a copyright owner could prevent unauthorized reproduction but not unauthorized distribution. 2 Nimmer on Copyright § 8.12[D] (1986). Similarly, it would make no sense if a copyright owner could prevent the making of unauthorized copies or phonorecords by mechanical photocopying or recording but not prevent the saturation of the market with unauthorized parallel imports. The importation right does no more than ensure the copyright owner that control.[15] In effect, § 602 erects an impene-

---

**14.** The first draft of the importation right circulated in 1963 stated:

Importation into the United States of copies or records of a work for the purpose of distribution to the public shall, if such articles are imported without the authority of the owner of the exclusive right to distribute copies or records under this title, constitute an infringement of copyright ... V. A. Latman & J. Lightstone, The Kaminstein Legislative History Project 420 (1984).

It thus appears plausible that the intent of the drafters was not to connect the first sale doctrine to the importation right by labeling the latter a kind of distribution right. Rather, it is likely that the drafters intended to specify, in the event that the exclusive rights were separately owned, who could sue to prevent the unauthorized importation.

**15.** Fabric postulates the following scenario. Sebastian sells its copyrighted works to a salon in California with knowledge that they are to be sold in California. The salon then exports them to a salon in Mexico. When the Mexican salon discovers it cannot sell them all, it ships them back to California. I agree with Fabric that those imports do not infringe Sebastian's copyright. I arrive at that result, however, not by a first sale analysis but by recognizing that no harm has come to plaintiff's right to control the number of copies of its work available in the United States. The problem with applying the *Scorpio* first sale analysis in parallel importing cases is that it is not the intent of the seller that controls where the first sale occurred and hence whether the seller is protected but the Uniform Commercial Code.

trable shield forever safeguarding the copyright owner's ability to control the maximum number of copies or phonorecords of his work available in this country. This shield is expansive. It has withstood challenges based on the first amendment, *Stark, supra;* a compulsory licensing provision, *Harms, supra;* and the antitrust laws. *W. Goebel Porzellanfabrik v. Action Industries, Inc.,* 589 F.Supp. 763 (S.D.N.Y.1984). It will withstand challenge here.

■ In sum, the 1976 Act creates two types of distribution rights: one involving the act of vending, which is limited by the first sale doctrine, and one involving the act of importation, which is not. The right of Sebastian to control the importation of the gray market goods at issue here was not extinguished when those goods were first sold regardless of where plaintiff's products were first sold or first manufactured.

### D

I am fortified in this result because it accords with the intent of the architects of the importation right as specifically endorsed by Congress. The clear motivation of the panelists who advocated the creation of an importation right was the need, in their view, for a simple, clear, and speedy remedy to unauthorized importation. *See, e.g.,* Staff of House Comm. on the Judiciary, 88th Cong., 1st Sess., Copyright Law Revision (Part 2: Discussion and Comments on Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law) 212 (Comm. Print 1963)

(comments of Horace G. Manages and Sidney A. Diamond) & Panel Discussion and Comments on 1961 Report 275 (1961) (comments of American Book Distributors Council). Both the 1975 Senate Report and the 1976 House Report expressly adopted this concern and emphasized, to quote the Senate Report, that "... any unauthorized importer of copies or phonorecords acquired abroad could be sued for damages and *enjoined from making any use of them* even before any public distribution in this country has taken place." 1975 Senate Report at 151–52 (emphasis added). *See also* 1976 House Report at 170, 1976 U.S. Code Cong. & Ad.News p. 5786, ("... mere act of importation ... could be enjoined.").

The *Scorpio* analysis defeats this expression of Congressional intent. Thus, the *Cosmair* court was forced to engage in a difficult determination of where title passed in order to decide whether the first sale defense was applicable. The parties in this case have presented extensive papers on this issue. Were I to follow *Scorpio,* I would be required to conduct a complex factual hearing during which Sebastian would bear the burden of proof. Indeed, given the mechanical rules of the Uniform Commercial Code regarding the passage of title, it is possible for products to be shipped from America to another destination and back again without title ever passing outside of the United States. To allow the importation right to become entangled in such complex contractual issues contravenes the clear purpose of § 602(a): the creation of a copyright remedy when traditionally only a breach of contract action was available.[16]

---

**16.** Fabric raises two arguments which merit brief discussion. First, Fabric argues that under this court's reading of the Copyright Act, a copyright owner's right to control the importation of his works continues "throughout eternity", regardless of how many times the goods were resold and regardless of the fact that the copyright owner long ago received his fair share from his sale of the goods. This argument ignores the fact that no copyright can continue longer than fifty years after the death of the author. 17 U.S.C. § 302 (1982). It also ignores the fact that the central right of reproduction continues for the full term of protection.

Fabric's view of copyright assumes that a copyright owner's only interest is his monetary

gain from the first sale. While it is undoubtedly true that profit is of great interest to the copyright owner, it is well established that the law protects the copyright owner's interest in additional profit which often results from wise marketing strategies. For instance, in *Beechwood Music Corp. v. Vee Jay Records, supra,* 226 F.Supp. 8, at 13 (S.D.N.Y.1964), it was not immediate monetary harm which concerned the court but the indirect financial harm which flows from the loss of control over factors which ensure, when used wisely, maximum commercial success. *See also Harper & Row Publishers, Inc. v. National Enterprises, Inc.,* 471

## V

■ Having found a likelihood of success on the merits, there arises, with reference to WET and Shpritz Forte, whose texts are protected by certificates of copyright, a presumption of irreparable harm. *Educational Testing Services v. Katzman*, 793 F.2d 533, 543–44 (3d Cir.1986); *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir.1983), *cert. dismissed*, 464 U.S. 1033, 104 S.Ct. 690, 79 L.Ed.2d 158 (1984).

Fabric maintains that it is entitled to defeat this presumption and argues that Sebastian will not suffer irreparable injury absent an injunction because (1) it has already received its profits for the products at issue, (2) the number of products is finite, and (3) there can be no injury to Sebastian's reputation because Sebastian's products are available throughout retail stores in northern New Jersey.

I reject these arguments. As noted above, copyright law not only ensures the copyright owner immediate economic success but also protects it against the harm that comes from a loss of its ability to control the distribution of its works. *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 555, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985); *Beechwood Music Corp. v. Vee Jay Records, supra*, 226 F.Supp. at 13. Further, at the hearing on the preliminary injunction, Sebastian established that it is taking elaborate measures to combat the problem of both domestic and foreign diversion. These measures include coding its products to determine where the diversion is occurring and placing consumer alert labels on many of its products advising prospective purchasers that the product should only be sold through professional salons. The fact that plaintiff has not been totally successful in eradicating the problem does not without more rebut the presumption of irreparable harm. *Cf. Lottie Joplin Thomas Trust v. Crown Publishers*, 456 F.Supp. 531, 535 (S.D.N.Y.1977), *aff'd* 592 F.2d 651 (2d Cir. 1978) & *Hampton v. Paramount Pictures Corp.*, 279 F.2d 100, 104 (9th Cir.1960).

## VI

In balancing the harm to Fabric if the injunction is entered as to WET and Shpritz Forte against the harm to plaintiff if it is not, I find the balance of hardships favor plaintiff. If the court does not enjoin Fabric there is no question but that Fabric will act quickly to dispose of the products in question. There is no way, assuming plaintiff ultimately prevails, that it could ever retrieve these products. Further, in the unlikely event that Fabric prevails, it can seek to recover any losses it incurs from plaintiff.

## VII

As noted above, in light of the numerous questions surrounding the status of plaintiff's copyrights, plaintiff only presses the copyright preliminary injunction as to two of its products.[17] Plaintiff, however, requests that the court provide it with a hearing on its contract claim before suspending the restraints with reference to the remainder of its products.

■ A hearing would accomplish nothing because, even assuming that plaintiff could establish that Fabric had knowledge of the territorial restrictions contractually imposed on 3–D, I would nevertheless deny the application. When a claim is based on solely breach of contract, irreparable injury may be found only if money damages would be inadequate or impracticable. *ECRI v. McGraw Hill, Inc., supra*, 809 F.2d at 226. Evidence, in *ECRI*, concern-

---

U.S. 539, 555, 105 S.Ct. 2218, 2228, 85 L.Ed.2d 588 (1985).

Fabric also argues that this opinion relies erroneously and solely on the N.Y.U. Note. But the *Stark* court clearly considered and partially endorsed the view adopted here. Moreover, Colby, *The First Sale Defense—The Defense That Never Was*, 32 J. Copr. Soc'y 77, 98–99 (1984), was sharply critical of *Scorpio's* first sale analy-

sis. *See also* Donohue, *The Use of Copyright Laws to Prevent the Importation of "Genuine Goods"*, 11 N.C.J. Int'l L. & Comm. Reg. 183, 195–96 (1986), which adopts the same view as the N.Y.U. Note.

**17.** These two products account for slightly more than 50% of the dollar value of the products in dispute.

ing loss of good will and damage to reputation was not found to constitute harm that could not be adequately compensated by an award of damages. *Id.* In this case, there is no dispute over the exact value of the products not enjoined and, while perhaps difficult to calculate, any consequential damage is not incompensable.

Moreover, plaintiff cannot meet its burden of convincing me that the balance of hardships tips in its favor. If plaintiff had not misrepresented the status of its copyright registrations, both in its amended complaint and in open court, Fabric would have been free to dispose of the products not bearing a copyrighted text over three weeks ago. I do not doubt that plaintiff's misrepresentations were unintentional but plaintiff should not be the party to reap the benefit of its mistake. I am fortified in this conclusion by the fact that the products Fabric will now be permitted to sell will join enormous quantities of plaintiff's products being sold in outlets other than professional hair care salons.

Fabric is now free to dispose of plaintiff's products in its possession with the exception of the WET and Shpritz Forte products.[18] Sale of the latter two products is enjoined pending resolution of the case.

## VIII

In 1976 Congress enacted a revised Copyright Act which included for the first time a clear and broad importation right for copyright owners. Surprisingly, American businesses have been slow to recognize the power granted them to control the importation of gray market copyrighted works. Indeed, given the confusion in the trademark world, it is unclear why plaintiffs continue to rely on those uncertain rights when the copyright law provides such a formidable shield.

Sebastian has demonstrated in this case that it is likely to prevail on the merits of

its copyright claim and that it can satisfy the court on the other criteria the court must consider before granting a preliminary injunction. In so doing, Sebastian has demonstrated that gray market shampoos, conditioners and the like, products seldom associated with copyright protection, can be successfully kept out of this country under § 602(a).

The court will enter an order in accordance with this opinion.

## ORDER

This matter being opened to the court on plaintiff's motion for a preliminary injunction and the court having reviewed the papers submitted and having heard the argument of counsel and for the reasons expressed in this court's opinion dated June 1987,

It is on this 30th day of June, 1987

ORDERED that defendants, their officers, directors, agents, servants, employees and all those holding by, through, or under them, or any of them, including all parents, subsidiaries and affiliates of defendants, and all persons in active concert or participation with them or any of them, are enjoined pending the conclusion of this action from:

(a) distributing, transferring, selling, consigning or otherwise disposing of any products known under the trade name WET or Shpritz Forte manufactured and shipped by Sebastian to defendant Consumer Contacts (PTY) Ltd. d/b/a 3–D Marketing Services ("3–D Marketing") in sealed Container Nos. LYKU205110–7, LYKU202329–7, LYKU204058–7 and LYKU204658–5 for sale and/or distribution only in South Africa and its territories and which were diverted back to the United States for distribution and which appear to be in the possession, custody or control of defendant Fabric Limited; and

---

18. Inasmuch as I have determined that there is no first sale defense and that the law does not preclude a plaintiff from suing for infringements occurring prior to his filing of a copyright with the Copyright Office, plaintiff still has a valid § 602(a) claim as to all the goods Fabric intends to sell. Hence, it is no exaggeration to

say that those goods are literally "walking causes of action." Given the cost to plaintiff of tracing the distribution of those goods and the continued costs of this litigation, I urge the parties to consider some arrangement whereby Sebastian purchases these products from Fabric.

(b) doing any act or thing calculated or likely to cause confusion or mistake in the mind of the public or trade, or to deceive prospective purchasers, customers or members of the trade into the belief that said products are being distributed, sold, transferred, consigned or otherwise disposed of with Sebastian's authorization.