798 F.2d 100
 55 USLW 2116, 1 UCC Rep.Serv.2d 1082
 JOHNSON & JOHNSON PRODUCTS, INC., and Johnson & Johnson,
Ltd., and Johnson & Johnson Baby Products Company,
v.
DAL INTERNATIONAL TRADING CO., an agency or instrumentality
of the Polish People's Republic, Northeast Brokerage Co.,
Inc., and John Doe Quality King Manufacturing, Inc. and
Quality King Distributors, Inc.
Appeal of QUALITY KING MANUFACTURING, INC. and Quality King
Distributors, Inc.
 No. 85-5629.
 United States Court of Appeals,
Third Circuit.
 Argued April 28, 1986.
Decided Aug. 11, 1986.
Rehearing and Rehearing In Banc Denied Sept. 11, 1986.
 
 Edward M. Joffee (argued), Sandler & Travis, P.A., Miami, Fla., Budd, Larner, Kent, Gross, Picillo, Rosenbaum, Greenberg & Sade, Short Hills, N.J., for appellants.
 Gregory L. Diskant (argued), Eugene M. Gelernter, Patterson, Belknap, Webb & Tyler, New York City, Hannoch Weissman, Roseland, N.J., Eric I. Harris, Johnson & Johnson, New Brunswick, N.J., for appellees.
 Robert W. Steele, John R. Fornaciari, Steele, Simmons & Fornaciari, Washington, D.C., for amicus curiae K Mart Corp.
 Before SLOVITER and STAPLETON, Circuit Judges and LONGOBARDI, District Judge*.
 OPINION OF THE COURT
 STAPLETON, Circuit Judge.
 
 
 1
 This is an appeal from a preliminary injunction restraining appellants from selling, distributing, or otherwise disposing of certain products manufactured by appellees and in appellants' possession. Because we conclude that the district court committed an error of law and that the present record will not support a resolution of the legally relevant issue in appellees' favor, we will vacate the preliminary injunction.
 
 I.
 
 2
 Appellants are Quality King Manufacturing, Inc. and Quality King Distributors, Inc., both New York corporations ("Quality King"). Quality King is an independent distributor of national brand health and beauty aids. Its customers include large wholesalers and retail chains. Quality King participates in the so-called "gray market," where imported products are sold in the United States outside the manufacturer's distribution system, often contrary to the wishes of the manufacturer.
 
 
 3
 Appellees are Johnson & Johnson Products, Inc. ("J & J"), a New Jersey corporation, Johnson & Johnson, Ltd. ("J & J Ltd."), a corporation organized under the laws of Great Britain, and Johnson & Johnson Baby Products Company, a New Jersey corporation. Appellees are all operating subsidiaries of Johnson & Johnson, Inc., a New Jersey corporation.
 
 
 4
 Appellees claimed in the district court that J & J Ltd., which has its place of business in Great Britain, was fraudulently induced to sell 80,000 dozen toothbrushes and certain baby products to Dal International Trading Company, an instrumentality of the Polish People's Republic (hereinafter "Dal"). The alleged fraud consisted of an oral misrepresentation by Dal in February of 1985 that it intended to distribute the products in Poland only. But for this fraudulent assurance, say appellees, J & J Ltd. would not have entered the transaction.
 
 
 5
 In March of 1985, Dal ordered the products from J & J Ltd. No written contract was entered. However, J & J Ltd. did execute, in April of 1985, a written contract related to the Dal transaction with Wendexim Trading Company, Ltd., a British firm. The reason for the inclusion of Wendexim in the Dal transaction was the weakness of Polish currency, which necessitated an intermediate barter trade. This intermediate step involved an agreement under which Dal shipped a quantity of wood to Wendexim in return for Wendexim's transmittal of the payment for the wood to J & J Ltd., in satisfaction of Dal's obligation to pay J & J Ltd. for the toothbrushes and baby products.
 
 
 6
 At the end of June, 1985, J & J Ltd. delivered the toothbrushes to Dal at a J & J Ltd. factory in West Germany. The baby products were shipped from Great Britain at the beginning of June, 1985. Subsequently, J & J Ltd. learned that some or all of these goods had been diverted from their intended destination of Poland and were en route to the United States.
 
 
 7
 J & J Ltd. investigators followed the goods to the United States, where they came into the possession of Quality King. The goods were packaged in cartons, some of which bore J & J Ltd. shipping labels. The production codes on these labels corresponded to those of the products designated for Dal.
 
 
 8
 The route by which the J & J Ltd. products came into Quality King's hands was not fully documented below. In early 1985, a British firm called Cubro Trading Company, Ltd. somehow learned of the availability of the J & J Ltd. products and passed this information to Morris Greenfield, the proprietor of Tereza Merchandise Corporation in New York. Greenfield was not interested in the products but advised Glenn Nussdorf, the vice president of Quality King, of the availability of the goods. Nussdorf prepared a purchase order for 75,000 dozen toothbrushes in February of 1985, about the time when Dal and J & J Ltd. were negotiating the sale of 80,000 dozen toothbrushes. Later, Nussdorf added baby products to this purchase order.
 
 
 9
 Nussdorf had never done business with Cubro before this transaction, so he used Greenfield as an intermediary. The details of the transaction are unclear due to discrepancies in the record as to the disbursements made by Quality King. What is clear is that Quality King purchased and received the goods.
 
 
 10
 Before the goods arrived at Quality King's warehouse, the J & J Ltd. shipping labels had been stripped from most of the shipping cartons. Greenfield and Nussdorf testified that this was a common gray market practice designed to obscure the identity of supply sources. The protection of these sources is important to gray market middlemen, Nussdorf and Greenfield testified, because if the sources became known, the middlemen would be bypassed in subsequent transactions.
 
 
 11
 The J & J Ltd. products were priced by it for the Polish market at a level lower than the wholesale price in the United States for Johnson & Johnson products, and even lower than the wholesale price normally offered in Great Britain by J & J Ltd. By purchasing these products in Europe, Quality King was thus in a position to distribute them in the United States at prices below those being charged by J & J.
 
 II.
 
 12
 The district court granted the preliminary injunction after concluding that appellees were likely to prevail on the merits, that appellees would suffer irreparable harm if the injunction were not granted, that an injunction would not harm any other interested person, and that an injunction would not be contrary to the public interest. See Kennecott Corp. v. Smith, 637 F.2d 181, 187 (3d Cir.1980); American Hospital Supply Corp. v. Hospital Products Ltd., 780 F.2d 589, 593-594 (7th Cir.1986).
 
 
 13
 The court predicted that appellees would prevail on the merits because it found that Quality King was not a good faith purchaser under Section 2-403(1) of the Uniform Commercial Code (UCC).[1] Under this provision of the UCC, a seller with voidable title, such as that acquired by common law fraud, can transfer good title to a subsequent good faith purchaser. For merchants like Quality King, the UCC defines good faith as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." UCC Sec. 2-103(1)(b). If the subsequent purchaser lacks good faith, however, he acquires only the seller's voidable title and may be required to surrender the goods to the defrauded party.
 
 
 14
 While the district court concluded that Quality King had no actual knowledge of the alleged fraud, it found that the gray market transaction was conducted under "suspicious circumstances" that "cried out for inquiry." District Court Opinion at 23-24. In the district court's view, Quality King, as a result, should have made inquiries that would have uncovered the voidable title. In the absence of such inquiries, the court concluded, Quality King could not be said to have been "honest in fact."
 
 
 15
 The most suspicious circumstance noted by the court was the fact that "the entire trade in which Quality King is engaged is conducted in a manner designed to insulate a purchaser of goods from knowledge of potential illegality." District Court Opinion at 22. That is, the gray market trade practice of purposely obscuring the chain of title suggested to the court a silent conspiracy to avoid the consequences of bad faith purchase by preventing the transmission of actual knowledge of fraud in prior transactions. This practice was illustrated by the fact that the J & J Ltd. shipping labels had been stripped prior to arrival at Quality King's warehouse.
 
 
 16
 An additional suspicious circumstance, in the district court's view, was the fact that Nussdorf used Greenfield as an intermediary, thereby indicating Nussdorf's mistrust of Cubro. Finally, the price of the goods was so low that "Quality King must have known that ... [J & J Ltd. would not have knowingly sold] ... its products in Europe for resale in the United States." District Court Opinion at 24.
 
 III.
 
 17
 The district court was undoubtedly justified in concluding that Quality King had reason to suspect that appellees would not approve of a sale of the toothbrushes and baby products to a U.S. distributor. Further, we believe the district court, having reached this conclusion, could appropriately infer that Quality King, in the minds of its officers and agents, subjectively suspected that appellees would not approve of its purchase of these goods. We believe the legally relevant question, however, is whether Quality King knew that the goods had been obtained from J & J Ltd. by fraud, or suspected as much and closed its eyes to the truth. This is a far different question involving an inquiry as to whether Quality King knew or had some reason to know that Dal orally represented to J & J Ltd. that it would distribute only in Poland and that this representation was made at a time when Dal had an affirmative intent to do otherwise.[2] The district court did not address this legally relevant question, and we believe the present record will not support an affirmative answer to it.
 
 
 18
 While the district court relied heavily on what it understood to be the nature of the gray goods market, there was very little evidence before it concerning that market and no evidence before it on the legitimacy of the means by which goods normally get into the gray goods market. The only substantial testimony concerning the workings of that market was the testimony given by Messrs. Nussbaum and Greenfield. Their testimony indicated only that the gray market exists because prices are often lower overseas than in the United States, and that gray market sellers are reluctant to reveal their supply sources for fear of being bypassed in subsequent transactions. This testimony provided a plausible explanation about why there is a gray goods market and why merchants in that market do not generally inquire about the intermediate sources in the distribution chain. However, it does not provide a basis for an inference that all those involved in importing less expensive gray goods know or suspect that there is a defect in the title of the goods which they purchase. Nor does the fact that Quality King was cautious in its dealings with Cubro, its immediate supplier, add enough to win the day for appellees.
 
 
 19
 Rather than address the legally relevant question of whether Quality King subjectively knew or suspected that there was a flaw in the title of one of its predecessors, the district court found that the circumstances called for inquiry and that, if Quality King had investigated, it would have learned that it was acquiring a voidable title. It is not as clear to us as to the district court that inquiry in this case would have uncovered the fraud. We consider that unimportant, however, because we believe the court committed an error of law when it held that Quality King had a duty to inquire and charged it with the knowledge that an investigation would have arguably disclosed.
 
 
 20
 The purpose of the good faith purchaser doctrine, codified in Sections 2-403 and 2-102 of the UCC, is to promote commerce by reducing transaction costs; it allows people safely to engage in the purchase and sale of goods without conducting a costly investigation of the conduct and rights of all previous possessors in the chain of distribution. Gilmore, The Commercial Doctrine of Good Faith Purchase, 63 YALE L.J. 1057, 1057 (1954) (The good faith purchaser "... is protected ... to the end that commercial transactions may be engaged in without elaborate investigation of property rights and in reliance in the possession of property by one who offers it for sale ..."); Farnsworth, Good Faith Performance and Commercial Reasonableness under the Uniform Commercial Code, 30 U.CHI.L.REV. 666, 671 (1963) ("Authority happens to favor the subjective test [of good faith purchase] in order to promote the circulation of goods and commercial paper."); Hawkland, Curing an Improper Tender of Title to Chattels: Past, Present and Commercial Code, 46 MINN.L.REV. 697, 721 (1962); 3 ANDERSON ON THE UNIFORM COMMERCIAL CODE 569-570 (3d ed. 1983). The imposition on a purchaser of a duty to investigate is thus fundamentally at odds with the rationale underlying these two sections of the UCC. Accordingly, in the absence of clear and controlling precedent so requiring, we are unwilling to sanction the imposition of such a duty on one in the position of Quality King.
 
 
 21
 As the district court recognized, we are required to apply the law of New Jersey, the forum state. Erie R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Neither the district court nor the appellees have referred us to any New Jersey case which suggests that its Supreme Court would impose a duty of inquiry upon a purchaser of goods under the circumstances of this case and we believe the New Jersey case law suggests the contrary.
 
 
 22
 The only case relied on by the appellees is a New York case, Porter v. Wertz, 68 A.D.2d 141, 416 N.Y.S.2d 254, 259 (1979), aff'd on other grounds, 53 N.Y.2d 696, 439 N.Y.S.2d 105, 421 N.E.2d 500 (1981). In Porter, a painting was entrusted to an art merchant who asked Peter Wertz, a delicatessen employee, to find a buyer for the painting. Wertz sold it to an art gallery that was unaware of the circumstances by which Wertz had come into possession of the painting. The lower court ruled that the gallery was not protected by UCC Section 2-403 because Wertz was not an art merchant selling the painting in the ordinary course of business. In addition, the court held that even if Wertz had been an art merchant, the gallery would not have been protected by the good faith purchaser provision of Section 2-403 because of its failure to inquire as to Wertz' source. The New York Court of Appeals affirmed on the first ground and withheld opinion on the second. Porter, 439 N.Y.S.2d at 107, 421 N.E.2d at 502. Whether or not a duty of inquiry exists in New York in these circumstances is accordingly unclear.
 
 
 23
 The New Jersey Supreme Court has not recognized a duty to inquire in similar circumstances. Indeed, when presented with the opportunity to adopt such a rule, a majority of the court declined to do so. In O'Keeffe v. Snyder, 83 N.J. 478, 416 A.2d 862 (1980), an artist brought a claim against a gallery owner allegedly in possession of a stolen piece of her work. The court found a genuine issue of material fact as to whether the work was stolen and remanded for trial. In doing so, the court noted that a failure of proof of theft would open an inquiry into whether the gallery owner had obtained the work by good faith purchase. The court left that issue unresolved, however. O'Keeffe, 416 A.2d at 868. The dissent, discussing Porter at length, criticized the majority for its failure to provide further guidance to the trial court and in particular to recognize a duty to investigate. Id. at 884-885.
 
 
 24
 We predict the New Jersey Supreme Court would not impose on Quality King a duty to inquire. This prediction is based on Breslin v. New Jersey Investors, Inc., 70 N.J. 466, 361 A.2d 1, 3-4 (1976) and the New Jersey authorities discussed therein. In Breslin, the Supreme Court of New Jersey affirmed the dismissal of a complaint brought by a testamentary trustee to recover for conversion of estate assets against the holders of a check drawn on the account of a corporation holding the allegedly converted trust assets. The court found the holders of the check to be protected by the holder in due course provision of UCC Section 3-302, which requires, among other things, "good faith." In addressing the good faith issue, the court noted that UCC Section 1-201(19) defines good faith as "honesty in fact" and analyzed the issue before it as follows:
 
 
 25
 "Good faith" is defined by the Code as "honesty in fact in the conduct or transaction involved". NJSA 12A:1-201(19). Good faith in this context "is determined by looking to the mind of the particular holder." General Investment Corp. v. Angelini, 58 N.J. 396, 403, 278 A.2d 193 (1971), citing New Jersey Study Comment 1B to NJSA 12A:3-302, at p 134; 12A:1-201(19). The study comment points out that under the predecessor Uniform Negotiable Instruments Law various tests of good faith evolved, most courts, including New Jersey's, having adopted the so-called "white heart" criterion. "Under this test, good faith is determined by looking to the mind of the particular holder who is claiming to be a holder in due course, not what the state of mind of a prudent man should have been." Study Comment 1B to NJSA 12A:3-302, supra, at p 134. The prior New Jersey law on the point was held to have carried over to the Code and its substance summarized by this court in the Angelini case, supra, as follows (58 NJ at 403, 278 A.2d at 196):
 
 
 26
 The test is neither freedom from negligence in entering into the transaction nor awareness of circumstances calculated to arouse suspicions either as to whether the instrument is subject to some defense not appearing on its face or whether the promise to pay is not as unconditional as it appears therein. Joseph v. Lesnevich, 56 NJ Super 340, 348 [153 A.2d 349] (App Div 1959).
 
 
 27
 And see Rice v. Barrington, 75 N.J.L. 806, 70 A. 169 (E & A 1908); Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 86 A.2d 201 (1952).
 
 
 28
 In Unico v. Owen, 50 N.J. 101, 109-110, 232 A.2d 405, 410 (1967) we said:
 
 
 29
 In the field of negotiable instruments, good faith is a broad concept. The basic philosophy of the holder in due course status is to encourage free negotiability of commercial paper by removing certain anxieties of one who takes the paper as an innocent purchaser knowing no reason why the paper is not as sound as its face would indicate.
 
 
 30
 Breslin, 361 A.2d at 3-4.
 
 
 31
 Breslin did not involve UCC Section 2-403 and the definition of merchant's good faith in UCC Section 2-103(1)(b). Nevertheless, because the purposes of the holder in due course and good faith purchaser doctrines are similar and because Section 1-201(19) and Section 2-103(1)(b) both define good faith in terms of "honesty in fact," we believe Breslin provides a strong indication of how the New Jersey Supreme Court would resolve appellees' claim. It clearly suggests that the answer to the question of whether Quality King was honest in fact is to be "determined by looking to the mind of [Quality King]" and not to "what the state of mind of a prudent man should have been" as a result of inquiry. General Investment Corp. v. Angelini, 58 N.J. 396, 278 A.2d 193, 196 (1971).
 
 
 32
 We also note that by adopting the subjective, "pure heart and ... empty head" standard of Lawson v. Weston, 170 Eng.Rep. 640 (K.B.1801), the New Jersey Supreme Court would be aligning itself with the prevailing view of the good faith purchaser concept. See Goodman v. Simonds, 61 U.S. (20 How.) 343, 15 L.Ed. 934 (1857) (adopting subjective standard of Lawson ); Braucher, The Legislative History of the Uniform Commercial Code, 58 COLUM.L.REV. 798, 812 (1958) ("honesty in fact" standard is subjective); Farnsworth, 30 U.CHI.L.REV. at 671.
 
 
 33
 As we have previously noted, the district court did not make, and the record will not support, a finding that Quality King suspected that fraud had been committed by a predecessor in interest. Accordingly, we may assume for present purposes that New Jersey would exclude from the good faith purchase category one who, though without actual knowledge, subjectively suspects that the title is flawed and proceeds with the purchase despite his or her suspicions. A purchaser may not be certain of the existence of a flaw and still have knowledge of sufficient facts to keep him from being fairly characterized as having been "honest in fact."[3] Excluding such a person from the good faith purchaser category is not the same, however, as judging a purchaser by the facts he or she might have obtained through an investigation of all prior transfers of the goods. By adopting the latter approach, the district court in this case imposed a burden on commerce which we believe the UCC did not intend that it should bear.
 
 
 34
 We hold, therefore, that the district court erred in concluding on this record that Quality King had a duty to inquire into the chain of title of the gray market goods.[4] Since the only inference supported by the record is that Quality King had neither knowledge nor suspicion of a fraud by Dal, appellees did not demonstate a likelihood of ultimate success and Quality King was improperly enjoined pendente lite.
 
 IV.
 
 35
 For the foregoing reasons, we will vacate the preliminary injunction.
 
 
 
 *
 Honorable Joseph J. Longobardi, United States District Judge for the District of Delaware, sitting by designation
 
 
 [1]
 "A purchaser of goods acquires all title which his transferor had or had power to transfer ... A person with voidable title has power to transfer a good title to a good faith purchaser for value."
 
 
 [2]
 It is important to note that the title of a purchaser from Dal would not have been voidable if all Dal had done was resell the goods in violation of a contract clause prohibiting resale outside Poland. If, at the time of contracting with J & J Ltd., Dal had intended to restrict the distribution of goods to Poland and only later decided to distribute the goods elsewhere, no fraudulent inducement to contract would have existed. J & J Ltd. would then have had a cause of action against DAl for breach of contract but subsequent purchasers from Dal would obtain good title. UCC Sec. 2-403(1)
 
 
 [3]
 The New Jersey Supreme Court has held, for example, that a holder of a note may have sufficient knowledge of underlying facts to support an inference that he had suspicion of a defect in title and, accordingly, is not a holder in due course. General Investment Corp. v. Angelini, 58 N.J. 396, 278 A.2d 193, 196-197 (1971)
 
 
 [4]
 At oral argument, appellees suggested that the district court's decision may have rested in part on that portion of the definition of good faith that refers to an objective standard: "the observance of reasonable commercial standards of fair dealing in the trade." UCC Sec. 2-103(1)(b). While the court spoke at length about practices in the gray goods market, it did not find that it was the practice in that market to investigate the chain of title. Indeed, the evidence suggested that this was not normally done. When a party relies upon trade practice in a situation of this kind, it bears the burden of producing admissible evidence of that practice. Brattleboro Auto Sales v. Subaru, 633 F.2d 649, 651 (2d Cir.1980). Since appellees tendered no evidence of trade practice, this portion of the definition of good faith does not aid them