395 S.E.2d 496

**Mary M. WELCH, et al.**

v.

**Don B. CAYTON, et al.**

No. 19144.

Supreme Court of Appeals of West Virginia.

June 26, 1990.

Walton S. Shepherd, Sissonville, for Ralph A. Grady Sr.

Eobert Bays, Ruley & Everety, Parkersburg, for Cabot Corp.

Orville L. Hardman, Hardman & Powell, Parkersburg, Alan Simms, Elizabeth, for Mary M. Welch, Michael D. Coccia.

John R. Haller, Haller & Wagner, Weston, for Don Cayton, Edward N. Hitt, Inland Oil Co.

Richard A. Hayhurst, Parkersburg, for Ashland Oil Co.

NEELY, Justice:

This case involves the ownership of the oil and gas underlying a forty-five acre tract of land located in Ritchie County. It is a dispute among an owner of the oil and gas estate, an owner of the surface, who believes he has title to the oil and gas as well, an oil exploration firm who found and extracted oil and gas under a lease from the surface owner, and two companies which purchased oil and gas from the exploration company.

Mary Welch, *et al.*, the appellees, (hereinafter Welch) claim ownership of the oil and gas by virtue of record title going back to 1889. The appellants, who clearly have rights to the surface, claim that the appellees' predecessors in title never took the oil and gas rights in their deed from the State because appellant Grady's predecessor had already acquired those rights through operation of *W. Va. Const.*, Article XIII, § 3,[1] and under the rule in *Peterson v. Hall*, 57 W.Va. 535, 50 S.E. 603 (1905). After reviewing the questions presented and the record developed, we conclude that the appellants have failed to establish their claim to the oil and gas in question, and we affirm the trial court's holding that Welch was the sole owner of the oil and gas estate.

In 1895, John Williamson, who owned a "fee"[2] interest in the forty-five acre tract involved in this case, deeded all of the oil and gas rights in the land to Charles Schmitz, *et al.* At that time, then, the oil and gas became separate from the surface estate, and each was vested in separate parties. For a number of years after the separation, however, the property continued to be entered on the land books of Ritchie County as a single "fee" estate.

In 1913, the oil and gas estate was first separately entered on the land books of Ritchie County, in the name of Charles Schmitz, *et al.* Mr. Schmitz, *et al.*, paid taxes on the separate estate until 1932, when Schmitz, *et al.* allowed the taxes to go delinquent. As a result of the delinquency, the oil and gas estate was sold to the State in 1933. After it had been sold to the State, the oil and gas estate continued to be listed in the land books in the name of Schmitz, *et al.*, but with a notation indicating that the land was sold to the state for taxes. In 1952, the oil and gas estate was finally sold by the Deputy Commissioner for Delinquent and Forfeited Lands to N.M. Welch. Mary Welch inherited the land from N.M. Welch. It is significant to the ultimate outcome of this case that the

---

1. Article XIII was intended to encourage people to enter unoccupied land, and to have occupied lands listed on the tax books. See "Taxation and Land Titles Under Article XIII of the West Virginia Constitution", 65 W.Va.L.Rev. 263, 272 (1963).

2. It is important to note that surface estates and mineral estates are considered whole estates in land, even though in the land books the term "fee" is used to refer to an estate containing both surface and oil, gas, and minerals ("OGM").

In *LaFollette v. Nelson*, 113 W.Va. 906, 170 S.E. 168 (1933), where this Court held a statute unconstitutional because it thwarted the forfeiture provisions of Article XIII, this Court also made it clear that separate estates in the minerals and the surface of a parcel of land are treated as whole estates, not as interests in the same estate:

It is, perhaps, needless to add that this decision has no bearing upon the situation as it effects the separate assessments of *whole estates in land,* such as oil and gas, timber, coal, etc. [emphasis added].

113 W.Va. at 909, 170 S.E. at 170.

mineral estate was separately listed in the land books every year from 1913.

Since 1895 the surface has been held and taxed separately from the oil and gas. In 1906, John Williamson conveyed the surface to Elizabeth Gorrell. In 1910, Ms. Gorrell conveyed the surface to B.C. Williamson, the deed noting that the 45 acres was subject to the former conveyance of the oil and gas rights by John Williamson. The 1931 taxes were not paid, and in 1936, the surface was sold at a sheriff's sale to H.P. Williamson. The tax deed, executed by the Clerk of Court of Ritchie County, expressly limited the conveyance to the surface only.[3] Mr. Williamson, in 1947, conveyed one-half of one acre to a Mr. Schrader, reserving all the oil and gas for the grantor.[4] In 1969, Mr. Williamson conveyed the 45 acres, 20 poles, less the one-half acre, to Appellant Grady, in a deed without reservation.

This dispute arose because the appellants, with rights to the surface only, sold oil and gas from the forty-five acre tract. In 1981, appellant Grady leased the oil and gas rights to appellant Hitt, who then assigned the lease to Inland Oil to do the actual drilling. Inland Oil, through its subsidiary Inland Exploration, completed a producing well in December of that year and began extracting oil and gas, selling the oil to Ashland Oil and the gas to Cabot Corporation. The Welches learned that oil and gas were being sold from the 45 acres, and brought suit to recover for the oil and gas removed from the oil and gas estate. Once Cabot Corporation and Ashland Oil received notice of the title dispute, they placed payments for further sales in suspense. The trial court granted Welch recovery against all of the defendants, including Ashland Oil and Cabot Corporation, for all oil and gas taken from the oil and gas estate, less the reasonable cost of production.

Appellants' claim to the oil and gas rights derives from the claim that their predecessor, H.P. Williamson, had. Mr. Williamson, like Mr. Grady, owned only the surface, but he claimed to own the oil and gas as well. Also like Mr. Grady, he granted an oil lease.

## I.

Appellants claim the oil and gas by operation of a Constitutional provision dealing with forfeited lands, *W. Va. Const.*, Article XIII, § 3,[5] as well as by operation of an old

---

3. Mr. Williamson's initials were changed in the land records. More importantly, Mr. Williamson's interest in the land was also changed in the tax records. The word "surface" was scratched out and "fee" was written in. It is likely that Mr. Williamson was trying to take advantage of the provisions that appellants claim operated to give him title. Mr. Williamson granted an oil lease, and there was a dry well drilled. If the well had produced as Mr. Williamson hoped, he likely would have gained title to the minerals, and appellants likely would prevail in the case at bar.

4. This reservation could mislead someone doing a cursory title examination. Understand that H.P. Williamson never had any mineral rights to reserve.

5. Article XIII, § 3, provides:

All title to lands in this State heretofore forfeited, or treated as forfeited, waste and unappropriated, or escheated to the state of Virginia or this State, or purchased by either of said states at sales made for the nonpayment of taxes and become irredeemable, or hereafter forfeited, treated as forfeited, or escheated to this State, or purchased by it and become irredeemable, not redeemed, released or otherwise disposed of, vested and remaining in this State, shall be, and is hereby transferred to, and vested in any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees), for so much thereof as such person has, or shall have had actual continuous possession of, under color or claim of title for ten years, and who, or those under whom he claims, shall have paid the state taxes thereon for any five years during such possession; or if there be no such person, then to any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees), for so much of said land as such person shall have title or claim to, regularly derived, mediately or immediately from, or under a grant from the commonwealth of Virginia, or this State, not forfeited, which but for the title forfeited, would be valid, and who, or those under whom he claims has, or shall have paid all state taxes charged or chargeable thereon for five successive years, after the year 1865, or from the date of the grant, if it shall have issued since that year; or if there be no such

statute applied in the case of *Peterson v. Hall,* 57 W.Va. 535, 50 S.E. 603 (1905).

■ Article XIII, § 3 provides for three ways to obtain good title to forfeited land. First, one who has actual continuous possession of the land for 10 years, and pays the taxes for five successive years during the possession will gain good title to the land. Second, if there is no one who fulfills the above requirements, one who holds title, regularly derived, from the State of West Virginia or the Commonwealth of Virginia, and pays taxes for five successive years, can take good title to the land. If no one meets the preceding requirements, then someone who possesses the land for five years and pays the taxes for those 5 years will gain good title to the land.

Mr. Grady's predecessor, H.P. Williamson, did not meet the requirements of any of the above provisions; he may have paid the taxes for more than five years, but he never took possession of the oil and gas estate. He possessed the surface only, which he had a right to possess. This Court has made it abundantly clear that "[m]ere possession of the surface, when it has been severed from the underlying minerals, is not possession of the severed minerals." *Bennett v. Neff,* 130 W.Va. 121, 145, 42 S.E.2d 793, 806 (1947).

To possess the oil and gas, H.P. Williamson would have had to take oil and gas out of the land, such as by drilling a producing oil well. This Court said in *Kiser v. Mc-Lean,* "[t]hough he own the surface and all other strata, he does not own the oil and gas. His possession of the surface cannot constructively extend to them.... He can only take possession of them by drilling wells." *Kiser v. McLean,* 67 W.Va. 294, 297, 67 S.E. 725, 726 (1910).

■ Drilling a dry well, however, such as was done under the lease from H.P. Williamson cannot accomplish the possession of oil and gas. In *Trust Co. v. Harless,* 108 W.Va. 618, 152 S.E. 209 (1930), this Court said, "[t]he mining of property

for coal occasionally does not constitute possession." 108 W.Va. at 629, 152 S.E. at 213. In that case the court insisted that to establish adverse possession by mining a mineral, one who asserts adverse possession must "keep his flag flying in a visible and hostile manner." *Ibid.*

The concern is that if the possession is not done continuously and openly, the owner may never have an opportunity to see that someone is threatening his rights. This is even more of a problem when the person asserting "possession" of minerals has a right to occupy the surface, as in the case at bar.

The second method of acquiring good title does not require possession, but requires some claim of title through a chain of title from the sovereign. H.P. Williamson held no such claim of title. His claim of title as asserted by the change from "surface" to "fee" in the land tax books is not the kind of title referred to in this section, so he was not, and appellants are not, helped by this provision.

As for the third method, Mr. Williamson did not possess the oil and gas estate for even a moment, so he cannot meet the requirement of five years of possession. If he had taken oil from a producing well for five years and paid taxes on the "fee" for those five years, he would have taken title to the forfeited oil and gas estate. Because he never took possession, however, he never took title under this provision.

Appellants cite the case of *Peterson v. Hall,* 57 W.Va. 535, 50 S.E. 603 (1905), in support of their claim that they received the oil and gas rights through the tax deed to the surface. In particular they quote from a syllabus point which states:

When the surface of land is owned by one person, the oil in place by another, a sale for taxes in the name of the owner of the surface will also pass the oil owned by the other person, his estate not being charged on the tax books, under section. 25, chapter 31, Code 1899.

person, as aforesaid, then to any person (other than those for whose default the same may have been forfeited or returned delinquent, their heirs or devisees), for so much of said

land as such persons shall have had claim to and actual continuous possession of, under color of title for any five successive years after the year 1865, and have paid all state

57 W.Va. at 535, 50 S.E. at 603. The syllabus point could easily mislead a lawyer who overlooks the language, *"his estate not being charged on the tax books"*, which language is dispositive in the case at bar. In the *Peterson* case, B.W. Peterson, the owner of the surface and oil and gas rights granted an oil lease to the South Penn Oil company, reserving a one-eighth royalty in oil. Peterson then conveyed 64 acres of the same land to Camisse Hall, subject to the oil lease and reserving one half of Peterson's royalty interest. The 64 acres was later sold for taxes to R.E.L. Snodgrass, who conveyed it to C.R. Snodgrass, who then made an oil lease with South Penn Oil Co. The question was whether Peterson's 1/16th interest in oil passed by the tax deed to Snodgrass.

The Court held that because Peterson's 1/16th interest was not charged on the books, and the entire 64 acres, including surface and oil and gas, was charged to Hall, Snodgrass took the 1/16th interest along with the tax deed. 57 W.Va. at 541, 50 S.E. at 605. Thus, the difference between *Peterson* and the case before us now is that, unlike Hall's interest in the oil and gas in *Peterson*, the oil and gas estate that went down to Welch was always charged separately on the books. Peterson likely made the mistake of thinking of his 1/16th interest in the oil as a royalty only, rather than as an interest in land. If he had made sure that the 1/16th interest in land was listed and taxed to him, it would *not* have passed by the tax deed to Snodgrass.

In the case before us, if the oil and gas estate had not been carried separately on the tax books, while H.P. Williamson paid taxes as if he owned both surface and oil and gas, Mr. Williamson might have gained title to the land. In fact, however, the oil and gas estate, although sold to the state, continued to be listed separately from the surface in the land tax books. Of course, *W.Va. Const.*, Article XIII, Sec. 3, provided ways for Mr. Williamson to take the forfeited oil and gas estate by adverse possession through drilling a producing well, but he did not do so.

taxes charged or chargeable thereon for said

It is clear that West Virginia's scheme of land title and taxation does not help appellants in this case. The oil and gas rights belong to appellee Welch, and only the surface rights belong to appellants.

## II.

Defendants Ashland Oil and Cabot Corporation have made cross-assignments of error to the trial court's order, contending that the trial court erred in concluding that they were liable to Welch for the value of oil and gas they purchased from Inland Oil and for which they have made full payment to Inland Oil. Ashland Oil and Cabot Corporation claim that the *UCC* good faith purchaser for value rule, *W.Va.Code*, 46–2–403 [1963], gives them good title to the oil and gas which they bought from Inland Oil before receiving notice of the land title dispute. The rule can apply to sales of oil and gas, but cannot protect Cabot Corporation and Ashland Oil because their seller did not acquire "voidable title" in a "transaction of purchase".

The provision which Cabot Corporation and Ashland Oil claim protects their purchases of oil and gas prior to notice, namely the good faith purchaser for value rule of *UCC* Article 2, is found at *W.Va. Code*, 46–2–403(1) [1963]. Article 2 provisions apply to contracts for the sale of goods. A contract for the sale of oil and gas to be removed from realty by the seller is a contract for goods. *W.Va.Code*, 46–2–107(1) [1974]. Because Inland Oil severed the oil and gas and sold it to Ashland Oil and Cabot Corporation, Article 2 provisions apply to the sales to Ashland Oil and Cabot Corporation. Specifically, the good faith purchaser for value rule applies, which provides:

(1) A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of

period.

purchase the purchaser has such power even though

(a) the transferor was deceived as to the identity of the purchaser, or

(b) the delivery was in exchange for a check which is later dishonored, or

(c) it was agreed that the transaction was to be a "cash sale," or

(d) the delivery was procured through fraud punishable as larcenous under the criminal law.

*W. Va. Code,* 46–2–403(1) [1963]. This provision partially overturns the old common law rules of *non dat qui non habet,* and *caveat emptor, qui ignorare non debuit quod jus alienum emit,* under which a seller could give no better title than he had, and a buyer bore the risk of bad title in his seller.

However, the old rule that a thief[6] cannot give good title remains. The modern cases holding that a good faith purchaser from a thief does not take good title to goods are many. Among them are *Jernigan v. Ham,* 691 S.W.2d 553 (Tenn.App. 1984); *Petition of Hennessy,* 343 Pa.Super. 293, 494 A.2d 853 (1985); *Olin Corp. v. Cargo Carriers, Inc.,* 673 S.W.2d 211 (Tex. App.1984).

In *Olin Corp. v. Cargo Carriers, Inc.,* the court stated "One who purchases property from a thief, no matter how innocently, acquires no title in the property; title remains in the owner." 673 S.W.2d at 216. The court also stated a principle particularly applicable to the case before us:

Although a seller may have possession and represents that he has title to the property, an innocent purchaser still cannot defend against the true owner, unless there has been some affirmative act by the owner which either creates apparent authority to sell the property in the

seller or clothes the seller with the indicia of ownership.

673 S.W.2d at 216.

In *Jernigan v. Ham, supra,* the court explained how a defrauder can give good title to a good faith purchaser but a thief cannot:

The distinction between *theft* and *fraud* in this context is found in the statutory definitions of "delivery" and "purchase." Delivery concerns a voluntary transfer of possession ... and purchase refers to a voluntary transaction creating an interest in property.

691 S.W.2d at 556.

The new *UCC* rule rests on the premise that it is cheaper for an owner to take precautions against giving title to a defrauder than it is for a purchaser to research the chain of title to every good he purchases[7]. Before the original owner transfers title to someone who, in turn, will become a seller in a transaction of purchase, the original owner has an opportunity to take precautions against fraud, bad credit, and related commercial problems. The buyer may be lying to the owner, or may be using a bad check to pay for the goods. These are things an owner can, at least in theory, take precautions against. If, on the other hand, the person who later becomes a seller breaks into an owner's house and steals the good, or sinks a well and takes oil from the owner's oil and gas estate, the owner cannot take precautions as easily.

Mr. N.M. Welch never made any voluntary transfer to Mr. Grady, *et al.,* nor did he ever affirmatively create in them apparent authority to sell the oil and gas. Therefore, Mr. Grady, *et al.,* although innocent trespassers, held the void title that a thief holds. They had not "voidable title"

---

**6.** In this context the word "thief" is a word of art. In the case before us, we do not mean to imply that the appellant Grady and other appellants are guilty of conscious or criminal wrongdoing.

**7.** The rule's purpose is to facilitate the flow of goods in commerce. As the Third Circuit Court of Appeals said, in *Johnson and Johnson Products, Inc. v. Dal International Trading Co.,* 798 F.2d 100 (3rd Cir.1986):

The purpose of the good faith purchaser doctrine, codified in Sections 2–403 and 2–102 of the UCC, is to promote commerce by reducing transaction costs; it allows people safely to engage in the purchase and sale of goods without conducting a costly investigation of the conduct and rights of all previous possessors in the chain of distribution.

*Id.* at 104.

to transfer to a good faith purchaser as good title.[8] Therefore Ms. Welch will recover from Ashland Oil and Cabot Corporation as well as the other appellants, as to all of the oil and gas taken from the oil and gas estate. The decision of the trial court is affirmed.

Affirmed.

8. In fact, Grady, *et al.*, did not even have the bare "possession" that a thief would have, until 1981, when Inland drilled the producing well.