711 S.E.2d 601

**SER MONONGAHELA POWER COMPANY, Allegheny Power, Allegheny Energy Service Corporation, Defendants Below, Petitioners**

v.

**Honorable Fred L. FOX, II, Judge of the Circuit Court of Marion County; Shell Equipment Company, Incorporated and Shell Energy Company, Incorporated, Plaintiffs Below, Respondents.**

No. 11–0015.

Supreme Court of Appeals of West Virginia.

Submitted May 10, 2011.

Decided June 16, 2011.

spondents Shell Equipment Company, Inc. ("Shell Equipment") and Shell Energy Company, Inc. ("Shell Energy") as being barred by the statute of limitations. Petitioners argue that the trial court erred in ruling that the limitations period applicable to contracts for the sale of goods under the Uniform Commercial Code ("UCC")[1] does not apply to the coal sales agreement they entered into with Shell Equipment.[2] Upon a careful review of the statutory language at issue in conjunction with the terms of the coal supply contract, we determine that the subject agreement constitutes a sale of goods under West Virginia Code § 46–2–107(1) (2007). As a result, the four year statute of limitations established by the UCC for the sales of goods is controlling. Because Respondents did not initiate the lawsuit at issue until after the limitations period had expired, the trial court committed error in failing to grant Petitioners' motion to dismiss. Finding that Petitioners have demonstrated clear legal error for which they are entitled to relief, we grant a writ of prohibition.

## I. Factual and Procedural Background

In November 1999, Shell Equipment responded to a request of bid from Petitioners for the purchase of marketable and merchantable coal for use at Monongahela Power Company's Harrison Power Station located in Haywood, West Virginia. Shell Equipment was awarded a purchase order in response to its successful bid. To finalize the terms of the sale, a "Coal Sales Agreement" ("agreement" or "contract") was entered into on March 3, 2000, between Shell Equipment and Shell Sales Company, Inc., ("Shell Sales") as the Sellers and Allegheny Energy Supply Company, LLC, Monongahela Power Company, and the Potomac Edison Company as the Buyers.[3] The Sellers each bear a secondary designation under the contract: Shell Sales is also referred to as "Producer" and Shell Equipment as "Broker."

Under the terms of the agreement, Shell Equipment was obligated to supply the Petitioners with 8,000 tons of coal per month for

Avrum Levicoff, Denise R. Abbott, Levicoff, Siklo & Deemer, P.C., Pittsburgh, PA, for Petitioners.

James A. Varner, Sr., Debra Tedeschi Varner, McNeer, Highland, McMunn & Varner, L.C., Clarksburg, WV, for Respondents, Shell Equipment and Shell Energy.

McHUGH, Justice:

Monongahela Power Company, Allegheny Power, and Allegheny Energy Service Corporation (collectively referred to as "Petitioners") seek a writ of prohibition in connection with the November 9, 2009, ruling of the Circuit Court of Marion County denying Petitioners' motion to dismiss the breach of contract complaint filed against them by Re-

---

**1.** *See* W.Va.Code §§ 46–1–101 to 46–11–108 (2007).

**2.** Shell Sales Company, Inc., a sister corporation of Shell Equipment, was also a party to the contract at issue. Shell Energy was not a party to the subject agreement.

**3.** Respondent Shell Energy was not a party to the subject contract.

a two-year period[4] from the Baldwin Mine owned by Shell Sales. Because Shell Sales experienced a geologic problem known as a "squeeze," it was unable to produce the coal that it had agreed to supply to Petitioners.[5] In an attempt to fulfill its contractual obligations, Shell Equipment made arrangements to ship compliance coal from another mine. By letter dated March 13, 2000, Petitioners rejected Shell Equipment's proposal to deliver coal from another mine. Through this same communication, Respondents were notified that if the coal deliveries required under the contract failed to materialize by July 1, 2000, the contract was in jeopardy of being terminated. Petitioners issued a termination notice to Shell Equipment on July 14, 2000, which took effect that same date.[6] "Poor performance" was the reason stated for the termination.

Claiming that Petitioners were obligated to accept their offer of compliance coal, Respondents Shell Equipment and Shell Energy[7] instituted a breach of contract action on January 5, 2009. While a co-Seller under the agreement, Shell Sales is not a plaintiff in the breach of contract suit. In the complaint, Respondents set forth two theories of recovery: breach of contract and detrimental reliance. Petitioners responded to the complaint by filing a Motion to Dismiss or, in the alternative, Motion for Summary Judgment. As grounds for the motion, they asserted that Respondents' claims were time barred by the four-year statute of limitations provided by the UCC for contracts that involve the sale of goods. W.Va.Code § 46–2–725 (2007).

Opposing the Motion to Dismiss, Respondents argued that the ten-year limitations period that applies to written contracts is the controlling statute of limitations. See W.Va. Code § 55–2–6 (2008). Based on the fact that Shell Equipment and Shell Energy were not the parties who were charged with severing the coal, the trial court ruled that the subject contract did not constitute a sale of goods under the UCC. See W.Va.Code § 46–2–107(1). Finding the UCC's four-year statute of limitations to be inapplicable, the trial court denied Petitioners' motion to dismiss Respondents' breach of contract claim. The trial court did, however, dismiss count two of the complaint after ruling that there is no independent cause of action for detrimental reliance. Petitioners moved the trial court to reconsider its decision to deny their Motion to Dismiss on statute of limitations grounds and requested that the circuit court certify this issue for immediate appeal.[8] By its ruling of June 28, 2010, the trial court denied both of Petitioners' motions without comment.

## II. Standard of Review

The standard by which we determine whether a trial court exceeded its legitimate powers is set forth in syllabus point four of State ex rel. Hoover v. Berger, 199 W.Va. 12, 483 S.E.2d 12 (1996):

In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1)

---

4. The period of supply was from January 1, 2000, until December 31, 2001.

5. Respondents represent that this problem resulted due to the "lapse of time between verbal notification that Shell Equipment would ultimately get the bid and the time it actually got the purchase order." The bid was issued on November 9, 1999.

6. Due to the production issues, no coal was ever supplied to Petitioners under the subject agreement.

7. Shell Energy is not a party to the agreement. In the complaint, Respondents allege that "Shell Energy's involvement was to serve as the prospective source of the coal to be sold." The

contract at issue provides that Shell Sales is the intended coal producer.

8. As we recently observed in Riffle v. C.J. Hughes Const. Co., 226 W.Va. 581, 586 n. 5, 703 S.E.2d 552, 557 n. 5 (2010):

[T]he term "motion for reconsideration" is frequently misused by this State's bar. See, e.g., Richardson v. Kennedy, 197 W.Va. 326, 329, 475 S.E.2d 418, 421 (1996) ("Despite our repeated direction to the bench and bar of this State that a 'motion to reconsider' is not a properly titled pleading in West Virginia, it continues to be used."). Typically, parties file "motions for reconsideration" following final orders or judgments, when such requests should properly be made under Rule 59(e) or Rule 60(b).

whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Mindful of these standards, we proceed to consider the substantive issue presented by the petition.

### III. Discussion

 To resolve the issue of whether the UCC statute of limitations that governs contracts for the sale of goods is controlling, we must first determine the correspondent issue of whether the coal supply contract is a sale of goods within the meaning of the UCC. Under the UCC, "goods" are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale...." W.Va.Code § 46–2–105(1) (2007). Additionally, the definition of "goods" includes "other identified things attached to realty as described in the section on goods to be severed from realty (section 2–107) [§ 46–2–107]." While the parties agree that the outcome of this case turns on West Virginia Code § 46–2–107, they disagree on its application to the contract under discussion.

In an attempt to distinguish whether the UCC or realty law is controlling with respect to goods that are to be severed from realty, the following provision was adopted:

A contract for the sale of minerals or the like including oil and gas or a structure or its materials *to be removed from realty is*

*a contract for the sale of goods within this article if they are to be severed by the seller* but until severance a purported present sale thereof which is not effective as a transfer of an interest in land is effective only as a contract to sell.

W.Va.Code § 46–2–107(1) (emphasis supplied). The Official Comment to this section of the UCC recognizes that if the seller is the severer of the timber, minerals, or structures, then UCC law applies. Conversely, as the Official Comment explains, "[i]f the buyer is to sever, such transactions are considered contracts affecting land and all problems of the Statute of Frauds and of the recording of land rights apply to them." *Id.,* cmt.

In explanation of why mineral extractions are governed alternatively by realty law or the UCC, a commentator offers the following:

Under the first classification set forth in Section 2–107(1) [46–2–107(1) ], a contract for the sale and severance of minerals ... is a sale of goods only if the severance is to be done by the seller. Otherwise, presumably, the sale involves real estate. Thus, for example, a lease of coal land that gives the lessee the right to occupy the land and extract coal from it is classified as a real estate contract under Section 2–107(1), whereas it would be regarded as a transaction in goods, so far as the coal is concerned, if the mining were to be done by the seller. There are two reasons for this rule. First, mining leases in which the lessee has the right to make extractions are commonly understood to be real estate transactions, and the code drafters thought there was no good reason to disturb this understanding. Second, any contract giving a buyer the right to come onto land and separate things that are attached to it, necessarily gives the buyer some interest in real estate, if only the right of user. Where the seller is to do the severing, on the other hand, the contract does not necessarily give the buyer any real estate interest.

1Hawkland *Uniform Commercial Code Series* § 2–107:1 (footnotes omitted); *see also Tousley–Bixler Constr. Co. v. Colgate Enterprises,* 429 N.E.2d 979, 981 (Ind.App.1982)

("Thus, the UCC considers the sale of some items affixed to real estate as a sale of goods if they are to be severed by the seller.... If the seller is to sever ..., they are treated as goods because they would more likely be intended for sale after severance.").

Reasoning that because neither Shell Equipment nor Shell Energy was directly responsible for severing the coal from the subject realty under the agreement,[9] the circuit court reasoned that West Virginia Code § 46–2–107 did not apply. Petitioners posit that this interpretation of the statute is both overly narrow and erroneous. We agree.

■■■ The purpose of West Virginia Code § 46–2–107, as the Official Comment makes clear, is to determine whether realty law or the UCC governs a particular transaction. Where the minerals remain on the land as part of the sale and the buyer of the land is the entity who will sever the minerals, the body of realty law applies and these transactions are accordingly subject to recording statutes. When, however, the seller is charged with the right to sever the minerals as part of the contract, then the provisions of the UCC apply and there is no duty to record the sale.

Overlooking the basis for the "severed by the seller" language in Code § 46–2–107, the trial court placed undue emphasis on Shell Equipment's secondary designation as "Broker" under the agreement. Of more significance is the fact that Shell Equipment's primary and key designation under the contract was "Seller."[10] Simply put, the denomination of Shell Equipment as "Broker"[11] has no bearing on whether the UCC controls the contract at issue. What matters is that the Buyers under the contract were *not* contracting for the right to remove the coal themselves. *See Commonwealth Edison Co. v.*

*Decker Coal Co.,* 653 F.Supp. 841, 842 (N.D.Ill.1987) (rejecting argument that UCC was inapplicable to coal sales contract based on language giving buyer interest in unsevered minerals, finding that "the transaction as a whole falls squarely within § 2–107(1)" because buyer could "only exercise its right to sever the coal through the seller").

The fact that there were multiple sellers and only one of them was responsible for the coal severance is not determinative of whether UCC or realty law governs the subject transaction.[12] The decision of whether the UCC applies to this contract is controlled by which of the two parties to the contract had the right to extract the subject minerals: the buyer or the seller. *See Decker Coal,* 653 F.Supp. at 842 ("The test under UCC § 2–107(1) as to whether an interest in minerals is a contract for the sale of goods is whether the contract calls for severance by the seller.") Where the seller is the intended severer, as was the undisputed situation in the case before us, the contract is a sale of goods within the meaning of the UCC. *See* W.Va. Code § 46–2–107(1); *see also Welch v. Cayton,* 183 W.Va. 252, 256, 395 S.E.2d 496, 500 (1990) (recognizing that "[a] contract for the sale of oil and gas to be removed from realty by the seller is a contract for goods").

■■■ Petitioners suggest that Respondents sought to prevent the trial court from ruling that the agreement was subject to the UCC by intentionally omitting Shell Sales as a plaintiff in the underlying action. Even assuming such a strategy, the omission of one of two parties named as a Seller to a contract from a lawsuit cannot alter either the nature of the contract or the governing law. Coal, upon severance from the ground, is undeniably a movable thing which qualifies as a

9. *See supra* note 7.

10. Petitioners emphasize that Respondents assert the breach of contract claim in the complaint based on Shell Equipment's status as a seller and not as a broker.

11. Petitioners argue that this is not a typical brokerage contract because Shell Equipment committed to selling the subject coal, rather than to serve as a broker of coal.

12. As the parties acknowledged in their briefs and during oral argument, the seller under a coal supply agreement typically hires a third party to perform the coal severance duties. The fact that another entity performs the mineral extraction does not remove the contract from UCC law. *See Welch v. Cayton,* 183 W.Va. 252, 395 S.E.2d 496 (1990) (applying UCC law to contract for sale of oil and gas removed by seller's subsidiary).

"good" [13] under the general definition provided by West Virginia Code § 46–2–105(1). *See Consolidation Coal Co. v. Marion Docks, Inc.*, 2009 WL 2031774 at *9 (W.D.Pa.2009) (noting that "both Pennsylvania and West Virginia have adopted Article 2 of the Uniform Commercial Code which governs contracts for the sale of goods such as coal"); *Wyoming Bd. of Land Comm'rs v. Antelope Coal Co.*, 185 P.3d 666, 669 n. 3 (2008) ("After it is severed from the mineral estate, extracted coal is a 'good' within the meaning of the ... Uniform Commercial Code"). And where a coal supply agreement provides that the subject coal will be removed from realty by the seller, that contract constitutes a sale of goods under the provisions of the UCC. *See* W.Va.Code § 46–2–107(1).

 Because Respondent Shell Equipment and Shell Sales as "Seller(s)" were corporately charged with the duty to sever and supply the coal covered by the agreement to the Petitioners as Buyer(s), the contract clearly fell within the ambit of the UCC. We wholly reject Respondents' argument that the intended severance of the subject coal by Shell Sales [14] operated to remove the agreement from the reach of the UCC. Where only one of two parties designated as a seller under a coal supply agreement has the responsibility for mineral severance, the contract still qualifies as a sale of goods under the Uniform Commercial Code because the predicate requirement of West Virginia Code § 46–2–107(1), which controls whether goods severed from realty are subject to the protections of the Uniform Commercial Code, is that the seller, rather than the buyer, is the entity charged with the responsibility of severing the subject minerals. In this case, there is no doubt that Shell Sales, a co-Seller under the agreement and sister corporation of Shell Equipment, was responsible for the mineral severance at issue. As a result, the contract qualified as a sale of goods within the meaning of the UCC. *See* W.Va.Code § 46–2–107(1).

Having established that the agreement is a sale of goods under the UCC, we conclude that the four year statute of limitations period established by the UCC for sales contracts applies to this case. *See* W.Va.Code § 46–2–725(1). By determining that the agreement was not a sale of goods under the UCC and therefore not subject to the UCC's limitations period, the trial court committed error. Because Petitioners have demonstrated clear legal error, they are entitled to a writ of prohibition with regard to the trial court's ruling that the four-year statute of limitations provided in West Virginia Code § 46–2–725(1) was not applicable to the underlying case. *See* Syl. Pt. 4, *Hoover,* 199 W.Va. at 14–15, 483 S.E.2d at 14–15.

Writ granted.

---

**13.** The use of the singular and plural is interchangeable within the UCC. *See* W.Va.Code § 46–1–106(1) (2007).

**14.** *See supra* note 6.